IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| VALUE LINX SERVICES, LLC, an Oregon corporation and PRIORITY PAYMENT SYSTEMS WEST, an Oregon corporation,<br><br>        Plaintiffs,<br><br>   v.<br><br>LINX CARD, INC., a Delaware corporation; LINXPAY, INC., a California corporation; and LPH FINANCIAL, INC., a California corporation,<br><br>        Defendants. | No. 3:18-cv-02126-HZ<br><br>OPINION & ORDER |

Darian A. Stanford
Paul W. Conable
Steven D. Olson
Tonkon Torp LLP
888 S.W. Fifth Avenue, Suite 1600
Portland, OR 97204

       Attorneys for Plaintiffs

Brian T. Kiolbasa
Pilar C. French
Lane Powell, PC
601 S.W. Second Avenue, Suite 2100
Portland, OR 97204

       Attorneys for Defendants

1 – OPINION & ORDER

HERNÁNDEZ, District Judge:

This matter comes before the Court on Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint [ECF 23] and Motion to Strike Declaration of Tyler Young [ECF 28].

For the reasons that follow, the Court GRANTS in part and DENIES in part Defendants' Motion to Dismiss as follows: The Court denies Defendants' Motion as to Claims One, Four, and Five. The Court, however, grants Defendants' Motion as to Plaintiffs' Claims Two and Three. The Court dismisses those claims without prejudice and with leave to amend. To the extent that Plaintiffs intend to file a Second Amended Complaint, the Court directs Plaintiffs to do so no later than August 15, 2019.

The Court also GRANTS Defendants' Motion to Strike insofar as the Court declines to consider the Young Declaration and attached Exhibits in ruling on Defendants' Motion to Dismiss.

BACKGROUND

The following facts are taken from Plaintiffs' First Amended Complaint [ECF 22] and are assumed to be true at this early stage of the proceedings:

Plaintiff Priority Payment Systems West ("PPSW") is a credit-card processing company founded by Tyler Young. Plaintiff Value Linx Services ("VLS") is a related entity that Young created specifically to handle business with Defendant Linx Card, Inc.[1]

Linx is a payment-processing company that, as relevant to his case, sells gift cards bought at kiosks within cannabis dispensaries to allow consumers to purchase cannabis products without

---

[1] Young initially founded another entity, Norml Payment Processing, through which to handle his business relationship with Linx. Norml Payment Processing does not bear any relationship to the National Organization for the Reform of Marijuana Laws. VLS replaced Norml as the entity through which Young engaged in business with Linx. In any event, distinctions between the entities created by Young are not material to these Motions. Accordingly, the Court generally refers to Young's entities collectively as "VLS."

cash. VLS and Linx entered into a contract under which, as detailed below, VLS marketed Linx systems to cannabis retailers.

Defendants LinxPay, Inc., and LPH Financial, Inc., are California corporations that either share an address with Linx or are located nearby. Both LinxPay and LPH Financial made payments to VLS under its contract with Linx. From these facts Plaintiffs allege Linx delegated its duty to pay VLS to LinxPay and LPH Financial.

Because of restrictions under federal law, recreational-cannabis retailers have generally operated on a cash-only basis. Linx's products and services presented a mechanism by which consumers and retailers could complete transactions using a credit card. Linx placed kiosks inside the stores of participating cannabis retailers at which customers could use their credit card to buy a gift card. Those customers could then purchase cannabis products using the gift card, obviating the need for the consumer to complete the transaction in cash. Linx profited from these arrangements in three ways: (1) by charging a $2.00 "load fee" each time a consumer loaded money onto a Linx card; (2) by charging a $0.35 "transaction fee" every time a Linx card was redeemed at a retail store; and (3) by collecting a 2.75% "discount fee" from the retailer on every sale using a Linx card.

After learning of Linx's business from an associate, Young reached out to Linx's founders, Patrick Hammond and Kevin Senn, to propose forming a business relationship. On October 18, 2016, VLS and Linx entered into a contract by which "VLS would attempt to attract cannabis retail merchants in Oregon and elsewhere to use the [Linx] card system." First Am. Compl. [ECF 22] ¶ 12. Plaintiffs allege Linx had only eight active cannabis retail customers at the time they entered into the contract, two of which were in Oregon.

With respect to retailers that VLS convinced to user the Linx system, the contract provided Linx would be paid a $2.00 load fee, the $0.35 transaction fee, and a 2.95% discount fee.[2] These standard rates under the contract are referred to collectively as the "buy rate." If VLS could convince the retailers to enter into agreement to pay more than the buy rate, then VLS would earn 90% of the additional revenue while Linx would keep the remaining 10%. This split of the additional revenue above the buy rate is known as the "residual split."

Once the VLS portfolio reached a cumulative $1 million in processing volume, the contract provided Linx's "discount fee" would drop from 2.95% to 2.85%, with VLS earning the additional portion of the residual split. Once the VLS portfolio reached a cumulative $2 million in processing volume, the discount fee was to fall to 2.75%, the transaction fee would drop to $0.30, and VLS's share of the residual split was to increase to 95%.

The contract provided all residual payments to VLS were due within three to five business days of the end of each calendar month. In addition, the contract entitled VLS to its residual split even after the termination of the contract so long as retailers secured by VLS continued to use the Linx system.

With respect to the relationship between VLS and Linx, the contract provided VLS could promote Linx products in any state and would become the exclusive reseller of Linx products in Oregon after VLS attracted 25 retailers to use the Linx system. Moreover, after Linx "attained its initial goals" in Oregon, the contract provided VLS "could also receive exclusivity for the entire Pacific Northwest." First Am. Compl. ¶ 12. As for Linx's obligations, it agreed "not to pursue any end user's [*sic*] without VLS involvement for at least six months" and that Linx would

---

[2] The First Amended Complaint does not explain why the 2.95% discount fee under the contract was different from the standard 2.75% discount fee.

"provide at no cost to the [retailer] or VLS a full iPad station" on which to complete transactions. *Id.*

After entering into the contract Young set up Norml (which was later replaced by VLS). Young also diverted half of PPSW's credit-card processing workforce to work on matters related to Linx and hired a new salesperson primarily to work on the Linx contract. In December 2016 Young travelled to California to meet with Linx management. During those meetings Young discussed investing $100,000.00 in Linx. Senn and Linx's head of sales, John Wilson, however, told Young "to invest that $100,000.00 in VLS' sales efforts instead." First Am. Compl. ¶ 14. Plaintiffs allege "[i]n exchange for such investment and for devoting his time and energy to VLS and LINX rather than to PPSW's traditional credit card sales business, Kevin Senn and John Wilson promised that LINX would provide financial rewards." *Id.* ¶ 15. In particular, Plaintiffs allege Senn and Wilson promised Young that if "VLS invested $100,000 into VLS's sale efforts and focused on VLS rather than PPSW's credit card processing business, Mr. Young and VLS would be paid at or in excess of the level of Zach Senn (represented at around five percent) in the event of an exit." *Id.* As a result of this conversation Young and VLS spent approximately $130,000.00 enhancing VLS's sales efforts, shifted all but one PPSW credit-card employee to the Linx contract, and Young devoted "nearly all of his time" to the Linx matters.

By the end of July 2017 VLS signed over 60 "cannabis merchant applications" with retailers, of which 52 were actively using Linx services in August 2017 and 56 were actively using Linx services in September 2017. The "majority" of those retailers agreed to pay fees at the following rates: $3.00 load fees, $0.55 transaction fees, and 4.99% discount fees. *Id.* ¶ 17. By mid-May 2017 VLS had achieved the $1 million threshold necessary to lower Linx's discount rate to 2.85%. In July 2017 VLS achieved the $2 million threshold necessary to make the

discount rate drop to 2.75%, the transaction fee to fall to $0.30, and VLS's residual share to rise to 95%.

Plaintiffs allege Linx's residual payments to VLS were chronically late from the outset of their contractual relationship. The residual payments that VLS received came from either LinxPay or LPH Financial. By January 5, 2018, VLS had earned approximately $174,742.15 in residual payments. Defendants, however, had only paid $141,381.15 to VLS. Defendants did not make any residual payments for 2018. Although Defendants paid an additional $33,361 to VLS on May 1, 2018, Plaintiffs allege that amount only resolved the outstanding residual amounts from 2017. Plaintiffs allege they are entitled to residual payments in the amount of approximately $365,627.00 for 2018 with additional amounts for 2019 and prospective residual entitlements.

In Claim One Plaintiffs bring a breach-of-contract claim against all Defendants. In Claim Two Plaintiffs bring a claim for breach of the covenant of good faith and fair dealing against all Defendants on the basis that Linx "attempt[ed] to interfere with Plaintiffs' ability to perform under the 2016 Contract." *Id.* ¶ 35. In Claim Three Plaintiffs bring a claim against Linx for breach of an oral contract on the basis that Linx failed to pay Plaintiffs the amount equal to five percent of Linx's valuation as promised by Senn and Wilson at the December 2016 meeting. In Claim Four Plaintiffs bring a promissory-estoppel claim against Linx on the basis that VLS invested $130,000.00 in its company related to the Linx contract in detrimental reliance on the promises made at the December 2016 meeting. Finally, in Claim Five Plaintiffs bring a claim for unjust enrichment against Linx on the basis that Linx was unjustly enriched as a result of the actions VLS took in reliance on the promises made at the December 2016 meeting.

STANDARDS

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept all material facts alleged in the complaint as true and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett–Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012). However, the court need not accept unsupported conclusory allegations as truthful. *Holden v. Hagopian*, 978 F.2d 1115, 1121 (9th Cir. 1992); *see also Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) ("[W]e do not necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations") (internal quotation marks and alterations omitted). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face[,]" meaning "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

DISCUSSION

Defendants move to dismiss each of Plaintiffs' claims at least in part for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Defendants move to dismiss Claim One as to LinxPay or LPH Financial only. Defendants move to dismiss Claims Two, Three, Four, and Five in their entirety. In addition, Defendants move to strike the Declaration of Tyler Young [ECF 26] and the Exhibits attached thereto that Plaintiffs submitted together with their Response to Plaintiffs' Motion.

It is undisputed that this case is properly before this Court on diversity jurisdiction pursuant to 28 U.S.C. § 1332. Accordingly, the Court applies the substantive law of the State of Oregon and federal rules of procedure.[3] *Hyan v. Hummer*, 825 F.3d 1043, 1046 (9th Cir. 2016); s*ee also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

I. <u>Motion to Strike Young Declaration</u>

As a threshold matter, the Court must address whether it will consider the Young Declaration and its attached Exhibits as part of the record on Plaintiffs' Motion to Dismiss.

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). On a motion to dismiss the court may "consider materials incorporated into the complaint or matters of public record." *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010).

The incorporation-by-reference doctrine is intended to "prevent[] plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims." *Khoja*, 899 F.3d at 1002. The court may consider a document incorporated by reference into the complaint when the complaint "'refers extensively to the document or the document forms the basis of the plaintiff's claim.'" *Id.* (quoting *United States v. Ritchie*, 342 F.3d 903, 907 (9th Cir. 2003)). The "mere mention of the existence of a document," however, is insufficient to justify incorporation by reference. *Coto Settlement*, 593 F.3d at 1038. Although a document is properly considered on a Rule 12(b)(6) motion in the "rare instances when assessing the sufficiency of a claim requires that the

---

[3] The parties agree Oregon substantive law applies to this case and do not point to any evidence in the record from which the Court could reach any other conclusion.

8 – OPINION & ORDER

document at issue be reviewed," a document should not be considered if it "merely creates a defense to the well-pled allegations in the complaint." *Khoja*, 899 F.3d at 1002. Thus, "[a]lthough the incorporation-by-reference doctrine is designed to prevent artful pleading by plaintiffs, the doctrine is not a tool for defendants to short-circuit the resolution of a well-pleaded claim." *Id.* at 1003.

Moreover, "what inferences a court may draw from an incorporated document should also be approached with caution." *Id.* Although "a court 'may assume [an incorporated document's] contents are true for purposes of a motion to dismiss under Rule 12(b)(6),'" the court may not "assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.* (quoting *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006)).

A court may also consider materials outside the complaint if those materials are properly subject to judicial notice. *Id.* at 998. "Judicial notice under [Federal] Rule [of Evidence] 201 permits a court to notice an adjudicative fact if it is 'not subject to reasonable dispute.'" *Id.* at 999 (quoting Fed. R. Evid. 201(b)). "A fact is 'not subject to reasonable dispute' if it is 'generally known,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Id.* (quoting Fed. R. Evid. 201(b)(1)–(2)). A court, however, may not take judicial notice of "disputed facts contained in such public records." *Id.*

Defendants move to strike the Young Declaration and the attached Exhibits on three bases: (1) the complaint filed in California state court initiating an action by Linx against VLS attached Exhibit 2 to the Young Declaration should be stricken as immaterial and duplicative of the First Amended Complaint in this case; (2) Young's statement in paragraph four of the Declaration regarding the source of the residual payments is duplicative of the First Amended

Complaint; and (3) the letter and email attached as Exhibits 3 and 4 of the Young Declaration are outside the scope of the pleadings and, therefore, should not be considered on the Motion to Dismiss.

The Court agrees with Defendants that the California state-court complaint and the substance of the Young Declaration are duplicative of the Complaint and, therefore, are unnecessary to consider on Defendants' Motion to Dismiss. Plaintiffs rely on the letter and email attached as Exhibits 3 and 4 as support for their allegation that Linx interfered with Plaintiffs' attempts to perform under the 2016 Contract. *See* Am. Compl. ¶ 35. The First Amended Complaint, however, does not "'refer[] extensively to the document[s]'" nor do the "'document[s] form[] the basis of'" Plaintiffs' claims. *See Khoja*, 899 F.3d at 1002 (quoting *Ritchie*, 342 F.3d at 907). Accordingly, the Court concludes Exhibits 3 and 4 of the Young Declaration have not been incorporated to the First Amended Complaint, and, therefore, the Court may not consider them in the consideration of Defendants' Motion to Dismiss. After reviewing the Young Declaration the Court finds there is not any portion of the Declaration itself or the attached Exhibits that is both material and appropriate for consideration on Defendants' Motion.

Accordingly, on this record the Court grants Defendants' Motion to Strike and declines to consider the Young Declaration and the attached Exhibits in its evaluation of the merits of Defendants' Motion to Dismiss.

II.  Motion to Dismiss Plaintiffs' First Amended Complaint

As noted, Defendants move to dismiss each claim in Plaintiffs' First Amended Complaint at least in part.

A. <u>Claim One – Breach of Contract</u>

Defendants first assert LinxPay and LPH Financial must be dismissed because Plaintiffs have not alleged sufficient facts to state a claim against them in Claim One or, by extension, in Claim Two.[4] As noted, the only factual allegations specific to LinxPay and LPH Financial are that they are located at the same address or at an address near where Linx is located, and that the residual payments that VLS received came from LinxPay and LPH Financial. From these facts Plaintiffs further allege LinxPay and LPH Financial assumed obligations under the 2016 Contract, including the obligation to make residual payments to VLS.

Defendants assert these factual allegations are insufficient to state a claim as to LinxPay or LPH Financial. The Court disagrees. Although the allegations specifically relating to LinxPay and LPH Financial in the First Amended Complaint are limited, they are sufficient to give rise to a plausible inference that Linx delegated the duty to pay VLS to LinxPay and LPH Financial and that LinxPay and LPH Financial, therefore, may now be liable to Plaintiffs for breach as a result of their failure to continue to make residual payments. "Contract duties are generally delegable, unless prohibited by statute, public policy or the terms of the contract." 29 *Williston on Contracts* § 74:27 (4th ed. 2019). "Contractual duties are . . . not delegable if they involve the personal qualities or skills of the obligor, in the absence of consent by the obligee." *Id.* The alleged duty to make residual payments to VLS did not involve the personal qualities or skills of Linx, and Defendants do not cite any authority for the proposition that an entity that assumes contractual obligations cannot be liable for subsequent nonperformance of those obligations.

---

[4] Defendants do not seek dismissal of Claim One as to VLS.

11 – OPINION & ORDER

In their Reply Defendants rely on cases that hold assignees of contractual rights are not liable under that contract. *See Daniels v. Parker*, 209 Or. 419, 422–23, 306 P.2d 735 (1957); *Cascade Shopping Ctr. v. United Grocers, Inc.*, 106 Or. App. 428, 432, 808 P.2d 720 (1991)("As a matter of general contract law, even if an assignment of a contract is valid, it does not impose on the assignee liabilities of the assignor without the assignee's assumption of those liabilities. By assuming the assignor's liabilities, the assignee creates privity of contract with the party to whom the assignor is liable."). These cases are unhelpful to Defendants' Motion, however, because Plaintiffs do not allege Linx assigned its rights under the contract to LPH Financial or LinxPay; instead, Plaintiffs plausibly allege that Linx delegated at least its duty to pay VLS to LinxPay and LPH Financial. *See* 29 *Williston on Contracts* § 74:26 ("A clear conception of the law governing the assignment of contracts can be obtained only by sharply distinguishing between the attempted assignment of rights and the attempted delegation of duties."). If anything, *Cascade Shopping Center* suggests Plaintiffs allegations are sufficient to state a claim against LPH Financial and LinxPay because Plaintiffs plausibly allege those entities assumed Linx's liabilities under the contract and, therefore, created privity of contract with VLS. *See Cascade Shopping Ctr.*, 106 Or. App. at 432.

Accordingly, on this record the Court declines to dismiss Plaintiffs' Claim One as to LinxPay or LPH Financial.

      B.      <u>Claim Two – Breach of the Covenant of Good Faith and Fair Dealing</u>

As noted, in Claim Two Plaintiffs assert all Defendants breached the covenant of good faith and fair dealing by "attempting to interfere with Plaintiffs' ability to continue to perform under the 2016 Contract." First Am. Compl. ¶ 35. In their Response to Defendants' Motion to Dismiss Plaintiffs make clear that they are pursuing Claim Two in the alternative to Claim One

in anticipation that Defendants may argue they did not breach the contract because Plaintiffs failed to perform. Pls.' Resp. at 6–8.

Although Plaintiffs' legal theory on Claim Two may be viable, the allegations in the First Amended Complaint fall well short of providing sufficient factual support for such a claim. Plaintiffs, in particular, do not allege how Defendants attempted to interfere with Plaintiffs' ability to perform. Absent any such allegations, Plaintiffs' First Amended Complaint amounts to no more than the "labels and conclusions" that are insufficient to state a claim under Rule 12(b)(6). *See Iqbal*, 556 U.S. at 678.

Accordingly, on this record the Court dismisses Plaintiffs' Claim Two for failure to state a claim under Rule 12(b)(6). Although the Court does not consider such documents in its consideration of the merits of Defendants' Motion to Dismiss, the Court observes that some of the documents attached to the Young Declaration indicate that Plaintiffs may be able to allege additional facts relevant to Claim Two. Because leave to amend a complaint should be "freely give[n]," the Court dismisses Claim Two without prejudice and grants Plaintiffs leave to amend their complaint as to Claim Two. *See* Fed. R. Civ. P. 15(a)(2).

    C.    <u>Claim Three – Breach of Oral Contract</u>

As noted, Defendants move to dismiss Plaintiffs' Claim Three on the basis that the terms of the oral contract alleged in the First Amended Complaint are not sufficiently definite to be enforced.

The party asserting breach bears the burden of proving the existence of an enforceable contract in the first instance. *Holdner v*. Holdner, 176 Or. App. 111, 120, 29 P.3d 1199 (2001). In general, a contract may be oral or written. *Ponderosa Props., LLC v. Emp't Dep't*, 262 Or. App. 419, 435, 325 P.3d 762 (2014). When "determining whether a contract exists and what its terms

are," the court "examine[s] the parties' objective manifestations of intent, as evidenced by their communications and acts." *Ken Hood Constr. Co. v. Pac. Coast Constr., Inc.*, 201 Or. App. 568, 578, 120 P.3d 6, 11 (2005)). "If the parties' communications and actions manifest assent to be bound by promises, they will form a contract unless the promises are 'so indefinite that a court cannot determine what the parties intended.'" *Wieck v. Hostetter*, 274 Or. App. 457, 472, 362 P.3d 254 (2015)(quoting *Logan v. D.W. Sivers Co.*, 343 Or. 339, 347, 169 P.3d 1255 (2007)). To be enforceable the oral contract must represent a meeting of the minds on "the essential terms," but not necessarily all terms. *Pacificorp v. Lakeview Power Co.*, 131 Or. App. 301, 307, 884 P.2d 897 (1994). "A term is 'material' to an enforceable agreement when it goes to the substance of the contract and, if breached, defeats the object of the parties in entering into the agreement." *Johnstone v. Zimmer*, 191 Or. App. 26, 34, 81 P.3d 92 (2003).

Oregon courts have found contract terms too indefinite to be enforced when the terms do not provide a sufficient standard from which to judge the performance of the parties. For example, the Oregon Court of Appeals has found a promise to "check references" of prospective temporary employees to be too indefinite to be enforceable and, therefore, concluded the parties did not mutually assent to essential terms in an oral contract. *VTech Commc'ns, Inc. v. Robert Half, Inc.*, 190 Or. App. 81, 88–89, 77 P.3d 1154 (2003). The court reasoned that the term "check references" was too indefinite because the record did not reflect that the parties had agreed on any standard for determining how many references had to be checked, what it meant to "check" a reference, or how to evaluate any information gleaned while checking references. *Id.* at 89.

As noted, Plaintiffs contend Senn and Wilson promised Young that if he invested $100,000 in VLS's sales efforts and Young "devoted his time and energy to VLS and LINX

rather than PPSW's traditional credit card sales business," then Young and VLS "would be paid at or in excess of the level of Zach Senn (represented at around five percent) in the event of an exit." First Am. Compl. ¶¶ 14–15. Although the $100,000 investment term in the alleged oral contract would be sufficiently definite in isolation, Young was also required to "devote[] his time and energy to VLS and LINX rather than PPSW's traditional credit card sales business." *Id.* Like the term at issue in *VTech*, this term lacks any standard for determining whether Young had sufficiently "devoted his time and energy to VLS" rather than to PPSW. There is not any other basis in the First Amended Complaint from which to find the parties agreed on a standard for determining whether Young's efforts were sufficient to trigger Linx's additional obligation to pay Young and/or VLS.

On this record, therefore, the Court concludes the oral contract as alleged in the First Amended Complaint is not sufficiently definite to be enforceable. Accordingly, the Court dismisses Plaintiffs' Claim Three on that basis. The Court, however, finds Plaintiffs should be provided an opportunity to amend Claim Three in order to give them a chance to allege additional facts from which the Court could find the parties entered into an enforceable contract.

D. <u>Claim Four – Promissory Estoppel</u>

As noted, in Claim Four Plaintiffs bring a claim for promissory estoppel on the basis that VLS invested $130,000.00 in its company related to the Linx contract in detrimental reliance on the promises made at the December 2016 meeting. Defendants move to dismiss Claim Four on the basis that the promise allegedly made by Senn and Wilson was too indefinite for Plaintiffs to reasonably rely on that promise, and, in any event, VLS's alleged reliance was not foreseeable.

"In Oregon, courts 'use the term promissory estoppel to refer to two similar but distinct concepts.'" *Global Exec. Mgmt. Solutions, Inc. v. Int'l Bus. Mach. Corp.*, 260 F. Supp. 3d 1345,

1381 (D. Or. 2017)(quoting *Lash v. PNC Bank, N.A.*, No. 3:14-cv-01791-SI, 2015 WL 1319321, at *3 (D. Or. Mar. 24, 2015)). "In the first, 'actions taken in reliance on a definite promise may serve as a substitute for consideration[.]'" *Id.* (quoting *Lash*, 2015 WL 1319321, at *3). "In the second application of the theory, 'a party acts in reliance on an indefinite promise to create a binding obligation.'" *Id.* (quoting *Lash*, 2015 WL 1319321, at *3). Plaintiff's promissory-estoppel claim relies on the second theory of the doctrine.

A claim based on the second conception of promissory estoppel has four elements: (1) a promise; (2) which the promisor could reasonably foresee would induce conduct of the kind which occurred; (3) the plaintiff actually relied on the promise; and (4) the plaintiff's reliance on the promise resulted in a substantial change in position. *Neiss v. Ehlers*, 135 Or. App. 218, 223, 899 P.2d 700 (1995). "[P]romissory estoppel can apply, under appropriate circumstances, to promises that are indefinite or incomplete." *Id.* at 228. The *Neiss* court further explained:

> The evil to be rectified through promissory estoppel is not the breach of the promise, but the harm that results from the promisor's inducement and the promisee's actions in reliance. The fact that a promise is indefinite, incomplete or even incapable of enforcement according to its own terms, does not mean that *no* redress should be possible for the damage that directly flows from the promisee's reliance on the promise.

*Id.* at 229 (emphasis in original). "In other words, 'promissory estoppel derives from a promise that induces reasonably foreseeable, detrimental reliance[.]'" *Global Exec. Mgmt. Solutions*, 260 F. Supp. 3d at 1381 (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1108 (9th Cir. 2009)). Accordingly, under this conception "only reliance damages are allowed." *Id.*

At this early stage of the proceedings the Court concludes Plaintiffs have sufficiently stated a claim under a promissory-estoppel theory. Although, as noted, the term requiring Young to devote his time and energy to serving the Linx contract is too indefinite to be enforceable on a breach-of-contract theory, the First Amended Complaint sets out a fairly straightforward basis

16 – OPINION & ORDER

from which to find the elements of a promissory-estoppel theory may be satisfied. Defendants' promise of payment equivalent to a five percent stake in Linx if Young and VLS made the requisite investment and performed their obligations is sufficient to satisfy the first element. It was reasonably foreseeable that such an alleged promise would induce Young and VLS to make such an investment. Moreover, taking Plaintiffs' allegations as true at this stage of the proceedings, Young and VLS actually made that investment and, in doing so, substantially changed their position through the expenditure of money and the diversion of resources away from PPSW's business.

Accordingly, on this record the Court concludes Plaintiffs state a plausible claim under promissory estoppel in Claim Four.

E. Claim Five – Quantum Meruit

As noted, in Claim Five Plaintiffs bring a claim that is alternative to Claim Three under a quantum meruit – or unjust enrichment – theory. Defendants move to dismiss Plaintiff's Claim Five on the basis that Plaintiffs cannot bring a claim for unjust enrichment when the parties have a valid contract.

"When quantum meruit and contract claims are pleaded in the alternative, the quantum meruit claim becomes relevant only if the contract does not address the services for which recovery in quantum meruit is sought." *L.H. Morris Elec., Inc. v. Hyundai Semiconductor Am., Inc.*, 203 Or. App. 54, 66, 125 P.3d 1 (2005). "Quantum meruit is a form of restitution where the plaintiff has performed services for defendant and seeks to recover their fair value. The law, in appropriate situations, will imply a quasi-contract." *Kashmir Corp. v. Patterson*, 43 Or. App. 45, 47, 602 P.2d 294 (1979).

As noted, Plaintiffs' quantum meruit claim is alternative to their oral-contract claim. The theory behind Claim Five is that Defendants reaped the benefits of the additional investment and effort that VLS undertook as a result of the alleged agreement reached at the December 2016 meeting, and that VLS is entitled to fair-value compensation for those efforts. Defendants, however, assert Plaintiffs' quantum meruit claim should be dismissed because the written contract governed the same "subject matter" as the alleged oral contract and, therefore, the existence of the written contract precludes a quantum meruit claim. As alleged in the First Amended Complaint, however, the oral contract governed a supplemental exchange of promises between the parties (*i.e.*, the additional investment and additional sales efforts in exchange for greater compensation), not the benefits that Defendants allegedly reaped from the performance of the original written contract. Although Plaintiffs will bear the burden of demonstrating that Defendants reaped additional benefit from the distinct actions that Plaintiffs undertook as a result of the alleged oral agreement, Defendants are incorrect that the original contract governs the alleged conduct underlying Claim Five.

Because Plaintiffs' allegations relevant to Claim Five otherwise establish a plausible basis for relief on a quantum meruit theory, on this record the Court declines to dismiss Plaintiffs' Claim Five.

CONCLUSION

For these reasons, the Court GRANTS in part and DENIES in part Defendants' Motion to Dismiss [ECF 23] as follows: The Court denies Defendants' Motion as to Claims One, Four, and Five. The Court, however, grants Defendants' Motion as to Plaintiffs' Claims Two and Three. The Court dismisses those claims without prejudice and with leave to amend. To the extent that

Plaintiffs intend to file a Second Amended Complaint, the Court directs Plaintiffs to do so no later than August 15, 2019.

The Court also GRANTS Defendants' Motion to Strike [ECF 28] insofar as the Court declined to consider the Young Declaration and attached Exhibits in ruling on Defendants' Motion to Dismiss.

IT IS SO ORDERED.

DATED this \_\_6\_\_ day of August, 2019.

_____
MARCO A. HERNÁNDEZ
United States District Judge